## In re TURNER.

**Patent Appeal No. 5033.**

Court of Customs and Patent Appeals.

June 25, 1945.

William B. Jaspert, of Pittsburgh, Pa., for appellant.

W. W. Cochran, of Washington, D. C. (R. F. Whitehead, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 25, 26, 27, and 30 in appellant's application for a patent for an invention relating to a method of separating light hydrocarbon gases or vapors such as are ordinarily present in natural gas.

Four claims (Nos. 7, 8, 28, and 29) were allowed by the Primary Examiner.

Counsel for appellant has moved to dismiss the appeal as to claim 30. The motion will be granted.

Claim 25 is sufficiently illustrative of the claims on appeal. It reads: "25. The method of separating gases which comprises passing the gases or vapors through a unitary mass of adsorbent material contained in an enclosed space of gradually reducing cross-sectional area and heating said adsorbent material progressively from the large to the reduced area of the mass to separate the adsorbed components into fractions of the gases in the sequence in which they are released by the distillation."

The single reference cited against the appealed claims is: Vosburgh, 2,017,779, October 15, 1935.

Appellant discloses in his application an elongated body or fractionating column of refractory material, such as activated charcoal, in a single chamber. The fractionating column which is generally in a vertical position, but may be "placed in a reclining position or oriented in any other way," is composed of contiguous sections of varying diameters and lengths, the larger section being at the bottom of the column. The column, therefore, is of gradually reduced cross-sectional area. The gases to be fractionated are introduced at the bottom of the column through an inlet in the chamber, and when the column is filled the valve in the conduit leading into the chamber is closed. The fractionating column of activated material is heated externally by an electrical resistance heater which is designed to move along the chamber from

the bottom upwardly "to progressively heat the adsorbent material as the fractionating process progresses."

As stated in the quoted claim, appellant's process comprises passing gases "through a *unitary mass* of adsorbent material contained in an enclosed space of gradually reducing cross-sectional area and heating said adsorbent material progressively from the large to the reduced area of the mass to separate the adsorbed components into fractions of the gases *in the sequence in which they are released by the distillation.*" (Italics ours.)

Appellant states in his application that as the gases are driven upwardly through the adsorbent material, the individual components are separated into layers, each of which consists of a "substantially pure component." Apparently some of the layers are not substantially pure, and in order that the volume of mixed gases in such layers may, as stated in appellant's application, "be reduced to a negligible value in comparison to the volume of pure components above and below it, the cross-section of the adsorbent bed at the outlet end of the column is substantially less than the cross-section at the charging [inlet] end." It is further stated in appellant's application that "Since the thickness of the stratum of mixed components is independent of the diameter of the cross-sectional area of the adsorbent bed, *the volume of adsorbed components in this stratum* [layer] *will decrease in direct proportion to the cross-sectional area, resulting in an extremely sharp separation of the individual components as they are delivered from the top of the column.*" (Italics not quoted.)

In other words, as we understand it, when an intermediate layer of *mixed components* passes through an adsorbent layer of gradually decreasing area, the separation of the components in the intermediate layer is effected owing to the fact that the mixed layer remains the same in thickness but contains a smaller volume of mixed components as its area decreases. Accordingly, some of the components which were formerly in the mixed layer are separated and pass into the layers of pure components above and below it, "resulting," as stated in the quoted excerpt from appellant's application, "in an extremely sharp separation of the individual components as they are delivered from the top of the column."

Appellant's process is intended to be used for laboratory analysis of gases, although it is stated in his application that it may be utilized for industrial purposes.

The patent to Vosburgh relates to a process for recovering carbon dioxide from a gaseous mixture, and discloses an apparatus for carrying out the process. The apparatus disclosed in the patent comprises two so-called "scrubbers" for cleaning the gas, that is, freeing it from sulphur compounds. The patentee discloses three chambers in parallel relation, referred to in the patent as a "primary accumulator tower," a "secondary tower," and a "final accumulator tower." The primary and secondary towers are of the same size, and are of uniform cross-sectional area. The third or final accumulator is of smaller dimensions, and is also of uniform cross-sectional area. The three chambers or towers are arranged serially and are interconnected by conduits, each of the conduits being provided with a valve so that it can be closed. Each of the chambers is provided with a coil of pipe to which steam is supplied, and each contains an adsorbent material, such as activated carbon. In the patentee's process, after the gas has been scrubbed or cleaned it is passed through the three towers by means of the interconnecting conduits. As it passes through the chambers it is adsorbed by the adsorbent material. The patentee states that after the activated material in the three towers has adsorbed all of the carbon dioxide of which it is capable, the valve in the conduit leading from the second scrubber to the primary accumulator tower is closed, thus preventing further gas from entering the primary accumulator tower from the scrubbers. Steam is then permitted to enter the steam coil in the primary accumulator tower and the gas which has accumulated in the adsorbent material is driven off by the heat into the secondary tower and the final accumulator tower, where, it is stated, the adsorption of carbon dioxide is increased and some of the undesirable gases are permitted to escape through a so-called "escape conduit." After the gas is driven from the primary accumulator tower, the valve in the conduit connecting the primary accumulator tower and the secondary tower is closed. Steam is then passed through the steam coil in the secondary tower and the gas which has accumulated in the adsorbent material therein is driven therefrom by the heat into the

third or final accumulator tower, where the adsorption of carbon dioxide increases and more of the undesirable gases are permitted to escape. Thereupon, the valve in the conduit connecting the secondary tower and the final accumulator tower is closed. Steam is then passed through the steam coil in the final accumulator tower and the gas in the adsorbent material, which the patentee states is nearly pure carbon dioxide, is driven out. It is stated in the patent that the adsorbent material will adsorb only a certain amount of carbon dioxide "from a gas mixture having a certain percentage of carbon dioxide therein, but will adsorb a greater amount of carbon dioxide gas when the percentage of carbon dioxide in the mixture is increased," and that such fact "would appear due to the probable establishment of an equilibrium between the amount of carbon dioxide adsorbed and the other gases in the mixture. Hence, when the gas mixture surrounding the activated carbon particles contains a higher percentage of carbon dioxide, this equilibrium is disturbed and more carbon dioxide displaces the other gases that are less readily adsorbed than the carbon dioxide, and which were adsorbed with the carbon dioxide under the prior conditions, and a further adsorption of carbon dioxide gas by the activated carbon results."

In his decision the Primary Examiner stated that appellant relied, in part, for patentability of the appealed claims on the limitation contained therein "passing the gases or vapors through a unitary mass of adsorbent material contained in an enclosed space of gradually reducing cross-sectional area"; that that limitation is an apparatus limitation which cannot lend patentability to the claims; that the reference patent discloses the use of three separate containers; that whether the mass of adsorbent material is in a single container or in a plurality of connected containers is merely a matter of mechanical design; that the patentee discloses "one area reduction between the second and third masses"; and that the patentee clearly discloses the " * * * concept of distilling the adsorbed gases successively from the inlet end toward the outlet. This produces a displacing (fractionating) action by the carbon dioxide. * * * This fractionation produces a fraction successively richer in carbon dioxide until that retained in the small adsorber attains the required degree of purity. * * * The reference thus discloses that the fractionation will be improved by decreasing the area of the adsorbent in the final stage. To make the area reduction gradually or to increase the number of area reductions is held an obvious carrying forward of the teaching in the Vosburgh patent."

The Examiner further stated that the limitation in the appealed claims "heating said adsorbent material progressively from the large to the reduced area of the mass" is fully met by the disclosure in the reference patent, and, accordingly, held that the appealed claims were unpatentable.

On appeal, the Board of Appeals stated that the appealed claims call broadly for separating gases, "and do not proceed further in the sequence of operations than successively heating the sections of adsorbent material"; that the claims do not call for the gradually reduced cross-sectional area of the mass being in a vertical position; that they are sufficiently broad to read on a horizontal disposition of the mass; that "The mere fact of having the adsorbent in a single container is of no significance unless the sections are vertically arranged so that there can be stratification by gravity"; that the claims do not call for any particular gases; and that not "all gas mixtures would stratify even if the sections of adsorbent were vertically arranged." The Board agreed with the Primary Examiner's view that the limitation in the claims "a unitary mass of adsorbent material contained in an enclosed space of gradually reducing cross-sectional area" is an apparatus limitation, which, the Board stated, is insufficient to differentiate the method defined by the appealed claims from the disclosure in the Vosburgh patent where the adsorbent material is in three separate compartments.

It will be observed that the Board did not hold that the so-called "apparatus limitation" was not properly in the appealed claims, but rather held that such limitation was not sufficient to lend patentability to the appealed claims in view of the disclosure in the Vosburgh patent.

It is apparent from the disclosure in the Vosburgh patent that all the patentee was attempting to do was to remove carbon dioxide from the gases employed by him, permitting the other gases to escape during the course of his process. He was not attempting to separate adsorbed components of gases into fractions in the sequence in

which they are released by distillation. Therefore, the three chambers or towers (two of which were of the same size and of uniform cross-sectional area, and the other of smaller dimensions but also of uniform cross-sectional area) disclosed by the patentee as being in parallel relation and arranged serially and interconnected by conduits were sufficient for his purpose.

We find no teaching or suggestion in the Vosburgh patent of separating the adsorbed components of the gases in the sequence in which they are released by distillation, and it is evident from appellant's application that that purpose could not have been attained by the use of the patentee's apparatus. Furthermore, we are not in accord with the views expressed by the Board of Appeals that having the adsorbent material in a single container, as called for by the appealed claims, is without significance because the unitary mass of adsorbent material is not required by the appealed claims to be vertically arranged. Obviously, the gas flowing through such a unitary mass, even though the mass is in a horizontal position, would become stratified, and appellant states in his application, as hereinbefore noted, that the unitary mass might be in either an inclined or a horizontal position.

We are of opinion that appellant's process of separating gases into a unitary mass of adsorbent material of gradually reduced cross-sectional area and separating the adsorbed components into fractions in the sequence in which they are released by distillation is neither taught nor suggested by the reference patent, and that, on the record presented, the appealed claims are patentable.

The appeal is dismissed as to claim 30.

For the reasons stated, the decision of the Board of Appeals is reversed as to claims 25, 26, and 27.

Reversed.